IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UPS SUPPLY CHAIN SOLUTIONS, INC., a Delaware Corporation, | |
| Plaintiff, | Civil Action No. |
| v. | |
| FOAM DEPOT, INC., a New York Corporation, | JURY TRIAL DEMANDED |
| Defendant. | |

## **COMPLAINT**

Plaintiff UPS Supply Chain Solutions, Inc. ("UPS-SCS") files this Complaint against Defendant Foam Depot, Inc. ("FDI"), showing as follows:

## **INTRODUCTION**

### 1.

This action arises from FDI's breach of the parties' Global Air Charter Services Agreement (the "Agreement"), which is attached herewith as Exhibit A. As a consequence of this breach, UPS-SCS has been damaged and FDI is liable under the terms of the Agreement in an amount to be determined at trial but not

less than $75,000, exclusive of attorneys' fees, costs, pre-judgment interest and post-judgment interest.

## PARTIES

2.

UPS-SCS is a Delaware Corporation with its principal place of business in Alpharetta, Georgia.

3.

FDI is a New York Corporation with its principal place of business in Cheektowaga, New York.  It may be served with process at 495 Aero Road, Suite 1, Cheektowaga, New York 14225, and/or in accordance with applicable law.

4.

This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because this action involves a controversy between citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interest.

5.

Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (3) because FDI consented to venue in this Court; agreed that this Court and/or the state courts of Georgia shall have exclusive jurisdiction over any action relating to a breach of

the Agreement; and a substantial part of the events or omissions giving rise to this action occurred in Fulton County, Georgia.

6.

This Court has personal jurisdiction over FDI because it consented to the jurisdiction of this Court.  Further, FDI entered into the Agreement, which is the subject matter of this action, in Fulton County, Georgia, and agreed to perform in this county by making payment to UPS-SCS here.

**FACTS**

7.

UPS-SCS is an international logistics company involved in, among other things, the international shipment of goods.

8.

FDI sells medical personal protective equipment (PPE), including face masks, gloves and foam products.  FDI imports certain goods from Asia.

9.

On April 9, 2020, UPS-SCS and FDI entered into the Agreement.

10.

In Section I of the Agreement, UPS-SCS and FDI agreed that UPS-SCS would charter one or more aircraft for the purpose of transporting FDI's goods.

3

The parties agreed that the chartered aircraft would be a B747-400F and depart from Hong Kong International Airport on April 18, 2020 for Anchorage International Airport and then depart Anchorage International Airport for Rickenbacker International Airport in Columbus Ohio on April 18, 2020.

11.

Under Section II.A of the Agreement, FDI agreed to pay UPS-SCS the Charter Fee specified in Exhibit A.  Paragraph B.1 of Exhibit A identifies the Charter Fee as $1,075,000.  Paragraph B.2 of Exhibit A provides that payment of the Charter Fee was "[d]ue 5 days prior to departure, April 13, 2020."

12.

FDI failed to pay the Charter Fee when due.

13.

Section V.H of the Agreement states that FDI "has responsibility for, and warrants its compliance with, all applicable laws, rules and regulations, including, but not limited to, customs laws, import and export laws, and government regulations of any country to, from through or over which its shipment is to be carried, and that all [g]oods tendered for Service comply with such applicable laws."

4

14.

FDI failed to secure adequate cargo documentation sufficient to ensure that its goods would clear customs.  As a result, on April 14, 2020, FDI cancelled the charter flight.

15.

Section X.D of the Agreement states that "[ [FDI] shall not have the right to cancel any charter flight unless [FDI] has, prior to the effective date of such cancellation, paid [UPS-SCS] a cancellation fee in the full amount as set forth in Exhibit A."   Section B.4 provides for cancellation fees and specifies that for cancellations where notice is given between 3 and 7 days from departure, the cancellation fee is 75% of the Charter Fee.

15.

FDI failed to pay the cancellation fee.  Accordingly, under the terms of the Agreement, FDI did not have the right to cancel the charter flight.

16.

FDI breached the Agreement.

17.

Section II.A of the Agreement states that "[a]ny unpaid balance outstanding for more than fifteen (15) days shall accrue interest at a rate of one and one half percent (1.5%) per month calculated from the due date of such invoice."

## COUNT ONE
(Breach of Contract)

18.

UPS-SCS incorporates Paragraphs 2-3 and 7-17 above as if fully set forth herein.

19.

The Agreement is a valid and binding contract.

20.

Under the Agreement, FDI agreed to pay UPS-SCS the Charter Fee of $1,075,000. FDI further agreed that it would have the right to cancel any charter flight *only* if it paid UPS-SCS the full cancellation fee set forth in Exhibit A.

21.

Section B.4 of Exhibit A states that, for cancellations between 3 and 7 days from the date of departure, the fee is 75% of the Charter Fee. Thus, in order to have the right to cancel the charter within 7 days of departure, FDI was obligated

to pay UPS-SCS $806,250 before the effective date of cancellation.  FDI failed and refused to pay the cancellation fee and, therefore, had no right to cancel the flight.

22.

FDI breached the Agreement.

23.

FDI's breach of contract has proximately caused damage to UPS-SCS.

24.

Under the terms of the Agreement, FDI is liable to UPS-SCS in an amount to be determined at trial, but not less than $75,000, exclusive of attorneys' fees, costs, pre-judgment interest and post-judgment interest.

**COUNT TWO**
(Attorneys' Fees and Expenses under O.C.G.A. § 13-6-11)

25.

UPS-SCS incorporates Paragraphs 2-3 and 7-17 above as if fully set forth herein.

26.

Pursuant to O.C.G,A. § 13-6-11, "where the defendant has acted in bad faith, has been stubbornly litigious or has caused the plaintiff unnecessary trouble and expense," the defendant is liable for the expenses of litigation, including reasonable attorney's fees and expenses.

7

27.

UPS-SCS made multiple good faith efforts to resolve this dispute without litigation but FDI, exhibiting a "so sue me attitude," rejected those efforts.

28.

By its conduct, FDI acted in bad faith, has been stubbornly litigious, and has caused UPS-SCS unnecessary trouble and expense.

29.

Accordingly pursuant to O.C.G.A. § 13-6-11, FDI is liable to UPS-SCS for the expenses of litigation, including reasonable attorneys' fees and expenses.

<u>Demand for Jury Trial</u>

UPS-SCS hereby demands a jury trial on all issues triable of right by a jury.

WHEREFORE, UPS-SCS respectfully prays that the Court will (1) issue process to FDI requiring that it appear and answer this Complaint; (2) try before a jury all issues triable of right by jury; (3) enter judgment in favor of UPS-SCS under Count One for breach of contract in an amount to be determined at trial, but not less than $75,000, exclusive of attorneys' fees, costs, and pre-judgment interest and post-judgment interest; (4) enter judgment in favor of UPS-SCS under Count Two for UPS-SCS's attorneys' fees and expenses incurred in pursuing this claim pursuant to O.C.G.A. § 13-6-11; (5) award UPS-SCS its costs as provided by law;

and (6) grant UPS-SCS such other and further relief as the Court deems just and proper.

Respectfully submitted this 17th day of August, 2020.

**WEINBERG WHEELER HUDGINS GUNN & DIAL, LLC**

*/s/ Jonathan R. Friedman*
Jonathan R. Friedman
Georgia Bar No. 277720
Gary J. Toman
Georgia Bar No. 714651
3344 Peachtree Road, Suite 2400
Atlanta, GA 30326
(404) 876-2700
jfriedman@wwhgd.com
gtoman@wwhgd.com

*Attorneys for Plaintiff*
*UPS Supply Chain Solutions, Inc.*

# EXHIBIT A



## GLOBAL AIR CHARTER SERVICES AGREEMENT
## UPS SUPPLY CHAIN SOLUTIONS, INC.

This Global Air Charter Services Agreement ("Agreement") is entered into this 9 day of April, 2020 (the "Effective Date"), by and between Foam Depot Inc, with offices located at 495 Aero Drive, Cheektowaga, NY 14225 ("Customer") and as indicated on the signature page of this Agreement, **UPS Supply Chain Solutions, Inc.**, with respect to Services provided in the Americas region ("UPS SCS"), UPS SCS, Inc. with respect to Services provided in the Canada region ("UPS SCS Canada"), UPS Europe SPRL with respect to Services provided in Europe, Middle East and Africa Region ("UPS SCS Europe"), and UPS Asia Group Pte. Ltd. with respect to services provided in the Asia-Pacific region ("UPS SCS Asia").

UPS SCS, UPS SCS Canada, UPS SCS Europe and UPS SCS Asia shall each be known as "SCS" as such term is used in the Agreement, but solely with respect to the Services provided in their respective regions. The term "SCS" also may include other subsidiaries and affiliate companies and joint venture companies of UPS SCS, UPS SCS Canada, UPS SCS Europe and UPS SCS Asia as UPS SCS, UPS SCS Canada, UPS SCS Europe or UPS SCS Asia may designate, but only with respect to the scope of Services provided by such subsidiary or affiliate or joint venture company. Customer and SCS are each a "Party" and collectively the "Parties".

### I.    Air Charter Services

SCS shall, on behalf of Customer, charter one or more aircraft from a third party carrier (the "Carrier") for purposes of transporting Customer's goods ("Goods") from origin airport to destination airport only, in accordance with the terms set forth in this Agreement, including its Exhibit A ("the Services"). Except as otherwise provided in Exhibit A, the Services do not include any other service related to the Goods, such as customs clearance, storage, or final delivery.

### II.    Charter Fees and Charges; Payment Terms

A.    In consideration of the Services provided hereunder, Customer shall pay SCS the aircraft charter fees ("Charter Fees") and other charges specified in Exhibit A.

B.    Except as otherwise provided in Exhibit A, Charter Fees shall be due and payable upon execution of this Agreement. SCS reserves the right to decline to provide Services and any outstanding charter flights shall not depart if Customer fails to pay the Charter Fees as required. For all additional charges due to SCS, SCS shall invoice Customer with payment due as set forth in the invoice. Any unpaid balance outstanding for more than fifteen (15) days shall accrue interest at the rate of one and one half percent (1.5%) per month calculated from the due date of such invoice.

C.    Except as otherwise provided in Exhibit A, the Charter Fees do not include additional applicable charges including, without limitation, fuel surcharges, landing rights, airport taxes and airport usage fees, detention charges, de-icing charges, charges for ground transportation, loading or unloading, storage, or palletizing services, other origin and destination charges, security and war risk fees, potential royalty and non-objection fees. Charter Fees also do not include special expense items (such as cargo skidding, shoring, dunnage, protective coverings) or special handling equipment fees (such as for cranes, heavy-duty forklifts, horizontal jibs, flatbed trucks and similar items), and such special expense items or special handling equipment shall be furnished and paid for by Customer.

D.    Customer shall pay, and shall indemnify and hold SCS harmless from, all taxes, duties and levies directly imposed by all foreign, federal, state, local or other taxing authorities (including, without limitation, export, sales, use, excise, and value-added taxes) based on the transactions or payments under this Agreement, other than taxes imposed or based on SCS's net income. SCS may advance such payments as may be required for the protection or advancement of the aircraft, crew, passengers or the Goods. Customer shall reimburse SCS for any such payments in accordance with this Section.

E.    The Charter Fees and other commercial terms contained in this Agreement are confidential to the Parties and may not be disclosed to third parties without prior approval.

### III.    Insurance

Customer shall be solely responsible for insuring Goods against all risk of loss, including theft or damage, if such insurance is desired. SCS assumes no responsibility to effect insurance unless it has expressly agreed to in writing, and SCS does not represent or warrant that such insurance can be placed.

### IV.    Security Endorsement; Hazardous Material Indemnity

A.    Customer acknowledges and agrees that in providing the Services hereunder, SCS will rely on the correctness and completeness of all documentation relating to the Goods, including dangerous goods, dangerous cargo or security risk shipments (collectively "Dangerous Goods") furnished by Customer, whether such documentation is in written or electronic format.



B.     Customer warrants, covenants and agrees that Customer has an affirmative, non-delegable duty to disclose to SCS any and all information necessary to provide the Services in full compliance with applicable law.   Customer further warrants, covenants and agrees that it will not tender or cause to be tendered or presented to SCS any Goods or Dangerous Goods not in full conformity with applicable law, and that it will comply with and ensure that all Goods (and any passenger) carried under this Agreement shall comply with all applicable laws and regulations of any country or state to, from, or over which the aircraft is to be flown on any flight, including without limitation those relating to the carriage of Dangerous Goods, live animals, and security or protection against terrorism.

C.     Customer hereby agrees to indemnify, defend and hold harmless SCS, and its successors, parent, and affiliate corporations, and their officers, shareholders, directors, board members and employees from and against any and all claims, liabilities, fines, penalties, damages, costs and expenses (including reasonable attorneys' fees) arising out of or relating to Customer's breach of any of its obligations under this Section.

## V.     General Terms Relating to the Goods

A.     Prior to the commencement of the Services, Customer shall furnish SCS with a declaration setting forth the complete description and weight of all Goods to be transported.  Customer shall provide SCS with all necessary information, in sufficient time, to allow compliance with U.S. Customs and Border Protection Automated Export System (AES) / Automated Manifesting System (AMS) and FDA requirements.  Customer agrees to provide when requested the commodity, declared value and Schedule B number of all Goods. Customer shall disclose, upon execution of this Agreement, any Goods that are licensable from the US Department of Commerce or US Department of State and provide all details including, but not limited to, the license number or if any exemptions or exceptions apply.

B.     Customer shall ensure that Goods are properly packed and labeled to insure safe transportation by ordinary handling, and any Goods susceptible to damage by ordinary handling must be adequately protected by proper packing and must be marked or bear appropriate warning labels.  SCS has the right, but not the obligation, to inspect all Goods.

C.     SCS retains the right to refuse carriage of Goods or other cargo that:  (a) is improperly packed or packaged, (b) cannot be reasonably loaded within the cube capacity of the aircraft or exceed the operational weight limitation of the aircraft, (c) is of such nature or have such defect as to indicate to SCS in its sole discretion that such transportation could not be furnished by SCS without loss of or damage to the Goods or aircraft, or without endangering the safety of a flight, the crew or any passengers, (d) is not suitable for carriage on aircraft, or (e) cannot be transported in accordance with the provisions herein or in accordance with applicable tariffs, laws or other domestic or foreign governmental rules and regulations.  Such right on the part of SCS shall not relieve Customer of responsibility for proper preparation, protection, packing and marking of the Goods or impose on SCS any liability for loss or damage resulting from Customer's breach of such responsibility or from the nature of or any defect in the Goods.

D.     SCS may return rejected Goods to Customer or its agent at the airport of origin at Customer's expense. Alternatively, SCS may abandon and/or release, after reasonable notice to Customer, any Goods which SCS has refused for carriage in accordance with this Section or which Customer has undervalued for customs purposes or misdescribed, whether intentional or otherwise, without incurring any liability whatsoever to Customer.  Customer shall defend, indemnify and hold SCS harmless from all claims, damages, fines and expenses arising therefrom.

E.     Any Goods accepted by SCS at Customer's Load and Count ("CLC") in sealed containers shall be delivered by SCS with the original seal.  SCS shall not be liable for any damages, losses or claims with respect to any Goods accepted by SCS at the CLC in sealed containers when SCS delivers such Goods in the original containers with the original seal, and Customer hereby unconditionally releases SCS from any such damages, losses or claims.

F.     Customs clearance is the responsibility of Customer and/or consignee, and not SCS.

G.     Customer certifies that no new or used coniferous (pine/spruce/fir) non-manufactured wood packing materials originating in the United States, Canada, China or Japan are used on any flight destined for any country in the European Union, unless treated and marked in accordance with U.S. Department of Agriculture and American Lumber Standard Committee guidelines or otherwise in compliance with all applicable European Union regulations.  Customer agrees to reimburse SCS for, and indemnify and hold harmless SCS from and against, any claims, additional expenses (including attorneys' fees), special, incidental, consequential or other damages or costs incurred or alleged to have occurred as a result of Customer's non-compliance.  Additional details concerning limitations on the use of non-manufactured wood packing materials in the European Union can be found at www.aphis.usda.gov/ppq/swp/eunmwp.html.

H.     Customer has responsibility for, and warrants its compliance with, all applicable laws, rules and regulations, including, but not limited to, customs laws, import and export laws, and government regulations of any country to, from, through or over which its shipment may be carried, and that all Goods tendered for Service comply with such applicable laws.



## VI.    Operations and Performance of Services

A.    The performance of the Services is subject to the receipt of consents and/or approvals of domestic and foreign governments, including, but not limited to, the timely granting of all takeoff, landing (including technical stops) and overfly rights, required to operate the flights.  Customer agrees to comply with the formalities required by all domestic or foreign administrative authorities at the place of origin, destination or elsewhere.

B.    Customer shall observe all operating rules and regulations of SCS and Carrier and comply with all reasonable instructions of the employees and agents of SCS or Carrier.  The aircraft and its crew shall at all times be under the exclusive command and control of the pilot-in-command, whose orders shall be strictly complied with by Customer and all passengers.

C.    Departure times and flight routes shall be established by SCS and are subject to and may be altered by aircraft or crew availability, aircraft routing, gate space, airport handling ability, weather conditions, fuel stops, and other operational factors.  Each party shall use commercially reasonable efforts to cause on-time departures.  Notwithstanding the foregoing and the Charter flight details set forth on Exhibit A, SCS shall not be liable for the failure of a flight to depart or arrive according to any predetermined time, schedule or route.   There are no stopping places which are agreed at the time of tender of Goods and SCS reserves the right without notice to route Goods in any way deemed appropriate, and/or to substitute alternative aircraft and/or Carrier for all flights, without penalty to SCS.  SCS also reserves the right to consolidate two or more shipments of Goods on one aircraft.

D.    In case of mechanical difficulties, damage to aircraft, unsafe conditions, adverse weather conditions, requirements of law, or other circumstances, the charter flight may be cancelled or delayed at the point of origin or at any other point, or any point on the itinerary may be omitted or changed.  In such event, SCS may take whatever steps it deems necessary for the protection of itself and any other parties, including sending collect communications for instructions, disposing of perishable Goods without instructions (with the proceeds from the sale of such perishable Goods paid to SCS for any monies due), or tendering Goods for onward carriage by other carriers to the destination airport.  In the event of the cessation or delay of the flight for any of the above reasons, Customer agrees that SCS shall be entitled to payment of the Charter Fees, or a prorated share of the Charter Fees, in accordance with the Services performed.  Charter Fees are not open to negotiation or concession after the fact due to service failures beyond the control of SCS.

E.    Customer shall be responsible for demurrage charges incurred for layovers in excess of permitted maximums at point of origin and destination and traffic stops for loading and unloading the Goods and customs clearance, or for any delays caused by, or which are the responsibility of Customer including, without limitation, unavailability of Goods for loading at specified times; inadequate packaging; delay in receipt of operational permits when the responsibility of Customer; delayed, inadequate or unacceptable customs documentation and other paperwork; delay in customs clearance for any reason caused by Customer; delay in loading and unloading the Goods when the responsibility of Customer; and any consequential delays resulting therefrom.

F.    In the event that any space available to the Customer shall not be utilized by Customer, Customer consents to the use by SCS of such space, without refund or reduction of the Fees, for the transport of SCS's personnel and property to the extent authorized by prevailing U.S. Department of Transportation regulations.

G.    Except as specifically set forth herein, SCS makes no express or implied warranties in connection with its Services.

## VII.    Liability

SCS'S LIABILITY SHALL BE LIMITED ACCORDING TO THE FOLLOWING:

A.    Except as specifically provided otherwise, loading and unloading of Goods shall be at the sole risk of Customer and SCS shall have no liability whatsoever to Customer for loss or damage arising from loading and unloading of Goods.

B.    If this shipment involves international carriage, the (i) Convention for the Unification of Certain Rules Relating to the International Carriage by Air, signed at Warsaw on 12 October, 1929; (ii) that convention as amended or supplemented by any protocol or supplementary convention; or (iii) the Convention for the Unification of Certain Rules for International Carriage by Air (Montreal, 28 May 1999) (each a "Convention"), may apply and limits SCS's liability for loss, damage, or delay to Goods.

C.    Except where a Convention mandatorily applies and provides otherwise, SCS's liability for loss or damage to Goods shall be limited to the higher of fifty dollars ($50) (USD) per shipment or fifty cents ($.50) (USD) per pound of Goods lost or damaged.   Customer and SCS agree that they have negotiated a reasonable limit of liability under the circumstances surrounding the transportation, the value of the Goods, and the Parties' respective business interests and rates charged.  Customer acknowledges that SCS agrees to provide services to Customer under these negotiated rates and terms based on Customer's agreement that SCS's liability shall be limited as set forth in this Agreement.  Customer expressly waives any right it may have to declare a value for the Goods, or to file a claim against SCS for loss or damage to the Goods in excess of these



amounts.  In no event shall SCS be liable for any damages or penalties of any kind arising from delayed Services, delayed departure or arrival, delayed delivery or failure to deliver within a specific time, or any special, incidental, or consequential damages.

D.       Without limiting the generality of Paragraph C, SCS shall not be liable for any loss or damage, delay or failure to perform Services caused in whole or in part by (i) the act or omission of Customer, consignee, or any other party claiming an interest in the Goods, (ii) the nature, defect or inherent vice of the Goods (including inadequate packaging), (iii) failure of Customer to observe any requirements or obligations in this Agreement, (iv) Acts of God, weather conditions, environmental or dangerous goods incidents, perils of the air, public enemies, public authorities acting with actual or apparent authority, acts or omissions of custom officials, authority of law, quarantine, riots, strikes, work stoppages or slowdowns, or other labor disputes or disturbances, local or national disruptions in ground or air transportation networks or systems due to events beyond SCS's control, disruption or failure of communication and information systems, disruption or failure of utilities, civil commotions or hazards incident to a state of war, mechanical delay of aircraft or other equipment failures on all international shipments, or (v) any other circumstances beyond SCS's control.

E.       It is hereby expressly agreed that the Carrier, including without limitation a Carrier that is a parent corporation, indirect or direct subsidiary, or affiliate of SCS, shall not in any circumstances whatsoever be under any liability whatsoever to Customer for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on its part while providing Services and, without prejudice to the generality of the foregoing, every limitation, exemption from liability, defense and immunity of whatsoever nature applicable to SCS, including as set forth in Paragraph C and D, above, shall also be available and shall extend to protect every such Carrier.

## VIII.    Claims

Except to the extent that international convention rules or other applicable mandatory laws apply and provide otherwise, all claims against SCS arising from or related to the Services shall be made in writing and received by SCS within 15 calendar days following the date on which the Goods were or should have been delivered.  Any action for loss or damage arising from a shipment shall be commenced within one (1) year from the date on which the Goods were or should have been delivered.  Any claims, including, but not limited to, demands for damages, refunds, credits, and any legal or equitable relief whatsoever, shall be extinguished unless the Customer or claimant timely and completely complies with all applicable notice and claims requirements and periods set forth in this Agreement.

## IX.     Indemnification

Customer hereby agrees to indemnify, defend and hold harmless SCS and its successors, parent corporations, subsidiary corporations and their officers, shareholders, directors, and employees, from and against any and all claims, demands, liabilities, fines, penalties, damages, costs and expenses (including, but not limited to, attorneys' fees and court costs) of any kind whatsoever ("Claims"), whether arising from any default under this Agreement or not, or in any way connected with this Agreement, or arising from any default on the part of Customer, Carrier, any consignee or any condition or inherent vice of the Goods carried under this Agreement, except to the extent such Claim is the result of SCS's willful misconduct or gross negligence.  The provisions of this Section shall survive termination of this Agreement.

## X.      Term & Termination

A.       This Agreement shall commence on the Effective Date and shall continue in full force and effect until the completion of the Services, unless terminated earlier in accordance with this Section.

B.       Subject to Paragraph D, below, either Party may terminate this Agreement on fifteen (15) days prior written notice to the other Party.

C.       SCS may terminate this Agreement upon any failure of Customer to pay when due any amounts due pursuant to Section II, which failure remains uncured for a period of ten (10) days after notice thereof.

D.       If provided for in Exhibit A, Customer shall not have the right to cancel any charter flight unless Customer has, prior to the effective date of such cancellation, paid SCS a cancellation fee in the full amount as set forth in Exhibit A.

## XI.     Notices

All notices required to be given hereunder shall be given in writing and served by personal delivery, registered or certified mail, return receipt requested, postage prepaid, or by UPS Next Day Air®.  Notices shall be deemed given on the date of personal delivery, or, if not personally delivered, on the date of receipt.  All payments and notices to the Parties shall be directed to the addresses provided below or such other address as either Party shall specify in a written notice in accordance with this Section.

**If to SCS:**
UPS Supply Chain Solutions, Inc.
12380 Morris Road
Alpharetta, GA  30005
ATTN:  Global Contracts Manager

**with copy to:**
UPS Supply Chain Solutions, Inc.
C/o United Parcel Service, Inc.
ATTN: Legal Department
55 Glenlake Parkway, NE
Atlanta, GA  30328

**If to Customer:**
Foam Depot Inc
495 Aero Drive
Cheektowaga, NY 14225

## XII.    Miscellaneous Provisions

A.    Relationship of the Parties.  Except as may be set forth in a duly executed Power of Attorney, the relationship between Customer and SCS shall be that of independent contractors, and this Agreement shall create no relationship of joint venturers, partners, employment or principal and agent between the Parties.  Except as may be set forth in a duly executed Power of Attorney, SCS has no right or authority to create any obligations expressed or implied on behalf of Customer, or to bind Customer in any manner except as provided in this Agreement.

B.    Assignment.  Customer shall not assign this Agreement or any of its rights or obligations under this Agreement without the prior written consent of SCS, and any purported assignment, sale, transfer, delegation or other disposition by Customer except as permitted herein shall be null and void. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.

C.    Governing Law; Jurisdiction and Venue.  Except where law or treaty mandate governing law, this Agreement shall be interpreted, construed and enforced according to the laws of the State of Georgia, without giving consideration to Georgia conflict of law and choice of law jurisprudence, and Customer and SCS (i) irrevocably consent to the jurisdiction of the United States District Court and the State courts of Georgia; (ii) agree that any action relating to the Services performed by SCS shall only be brought in such courts; (iii) consent to the exercise of in personam jurisdiction by such courts over it, and (d) further agree that any action to enforce a judgment may be instituted in any jurisdiction.  This Agreement shall not be governed by the United Nations Convention on Contracts for the International Sale of Goods.

D.    Severability.  In the event that any provision of this Agreement (or any portion hereof) is determined by a court of competent jurisdiction to be illegal, invalid or otherwise unenforceable, such provision (or part thereof) shall be enforced to the extent possible consistent with the stated intention of the Parties, or, if incapable of such enforcement, shall be deemed to be deleted from this Agreement, while the remainder of this Agreement shall continue in full force and remain in effect according to its stated terms and conditions.

E.    Waiver.  A waiver, express or implied, by either Party of any right under this Agreement or of any failure to perform or breach hereof by the other Party hereto shall not constitute or be deemed to be a waiver of any other right hereunder or of any other failure to perform or breach hereof by such other Party, whether of a similar or dissimilar nature thereto.  No failure to exercise and no delay in exercising any right, remedy or power hereunder shall operate as a waiver thereof.

F.    No Third Party Beneficiaries.  Except as set forth in Section VII (E), this Agreement is not intended to give, and shall not be construed to give, any person or entity other than the Parties hereto, any interest, any legal or equitable rights, any claims or remedies (including, without limitation, any third party beneficiary rights) under or by reason of this Agreement, or as a result of the performance or non-performance of the Services.

G.    Entire Agreement; Modification.  The terms and conditions of this Agreement, including Exhibit A, is the final, complete, and exclusive agreement of the Parties with respect to the Services contemplated hereunder.  The Parties shall not be bound by any representations, promises, inducements or agreements, verbal or written, prior or contemporaneous, not expressly set forth or referenced in this Agreement.  In the event of a conflict between this Agreement, any transportation document, including air waybill, issued in connection with the Services, or any other written agreement between the Parties, the terms of this Agreement shall control.  No modification of or amendment to this Agreement shall be effective unless in writing and signed by each of the Parties.



H.  Counterparts.  This Agreement may be executed in one or more counterparts, with the same effect as if the Parties had signed the same document.  Each counterpart so executed shall be deemed to be an original, and all such counterparts shall be construed together and shall constitute one Agreement.

The SCS-affiliated party(ies) signing below shall be the SCS party(ies) for purposes of this Agreement, and any SCS-affiliated party(ies) NOT signing below is NOT included as an SCS party.

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the Effective Date.

**UPS SUPPLY CHAIN SOLUTIONS, INC.**
**"SCS"**

**Signature** _Vito Losurdo_

**Printed Name** Vito Losurdo

**Title** VP Global Air Freight Services

**Date** April 9 2020

Foam Depot Inc
**"CUSTOMER"**

**Signature**

**Printed Name** JASON ARMSTRONG

**Title** PRESIDENT

**Date** 4/9/2020

**UPS EUROPE SPRL**

**Signature**

**Printed Name**

**Title**

**Date**

**UPS ASIA GROUP PTE. LTD.**

**Signature**

**Printed Name**

**Title**

**Date**

**UPS SCS, INC.**

**Signature**

**Printed Name**

**Title**

**Date**



**EXHIBIT A**
UPS Supply Chain Solutions
Global Air Charter Services Agreement

A.    DESCRIPTION OF SERVICES.

1.    Description of Goods: Gloves

2.    Charter Flight Details

| FLIGHT # | DEPART AIRPORT | DEPART TIME | DEPART DATE | DEPART DAY | ARRIVE AIRPORT | ARRIVE TIME | ARRIVE DATE | ARRIVE DAY |
|---|---|---|---|---|---|---|---|---|
| 1 | HKG | 0900Z | 18Apr2020 | Sat | ANC | 2000Z | 18Apr2020 | Sat |
| 2 | ANC | 2100Z | 18Apr2020 | Sat | LCK | 0345Z | 19Apr2020 | Sun |
| 3 | | | | | | | | |

3.    Aircraft Type: B747-400F

4.    Using aircraft type data, approximate maximum projected gross payload weight or payload volume is 100,000 KGs.

ANY PROJECTED PAYLOADS SHOULD IN NO WAY BE CONSTRUED TO REPRESENT A GUARANTEE. No confirmation of loadability is given and loadability of Goods is subject to volume and dimension of aircraft. The aircraft data reflects typical wind and temperature conditions over the scheduled flight plan. Current conditions, including, but not limited to, wind, temperature and weather on the date of the flight shall be used to determine maximum gross payload.

B.    CHARTER FEES

1.    Amount of Charter Fees: $1,075,000

| FLIGHT # | DEPART AIRPORT | DEPART TIME | DEPART DATE | DEPART DAY |
|---|---|---|---|---|
| 1 | HKG | 0900Z | 18Apr2020 | Sat |
| 2 | ANC | 2100Z | 18Apr2020 | Sat |
| 3 | | | | |

a.    The Charter Fees are subject to adjustment for foreign exchange rates, operational costs (which may include without limitation increases in fuel costs prior to the date Services are provided), and scheduling or routing changes.

b.    Charter Fees include:
   Aircraft Handling Charges
   Airport to Airport, including load/offload
   Cargo build / Cargo break

   Excluded Items:

   Origin Pickup Fees
   Destination Delivery Fees
   Non-Objection Fees, Royalties
   Cargo Acceptance Fees
   Any additional loading & un-loading equipment – i.e. Crane, Large Forklift, etc.
   Shoring an Frangible Material
   De-Icing, FET
   512b Charges, warehouse fees
   Terminal Fees
   Customs Fees
   War risk insurance

c.    Demurrage Charges:    Carrier shall have entire discretion in deciding the number of maximum layover at point of origin and destination and scheduled traffic stops for loading and unloading, clearance and similar requirements without any additional charge. If any delay in the commencement or completion of the Charter is caused by the Charterer or anyone acting on his behalf in excess of these maximums, demurrage shall run against the Charterer for such delay of USD 7500 per hour. These delays shall include, but are not limited to, unavailability of cargo 'ready-

Date: 4/9/2020
Name: JASON ARMSTRONG
Initial: JKA



for-carriage' loading at time specified, inadequate customs documentation, loading and unloading when the responsibility of the Charter or its agents, and any consequential delays resulting there from.

2. Payment of Charter Fees. Due 5 business days prior to departure, April 13th, 2020

3. Payment Instructions.  Unless otherwise specified by written agreement between the Parties, payment of the Charter Fees is to be made by wire transfer to the following account:

JP Morgan Chase
131 South Dearborn - 6th Floor
Chicago, IL 60603
Bank Phone: 800-568-8772

| ACH Routing and Account numbers | Wires Routing and Account numbers |
|---|---|
| ACH ABA # 071000013 | Wire ABA # 021000021 |
| Account Name: UPS Supply Chain Solutions | SWIFT Code CHASUS33 |
| Account Number: 731201737 | Account Name: UPS Supply Chain Solutions |
| Account Type: DDA | Account Number: 731201737 |
| Tax ID: 94-3083515 | Account Type: DDA |
| Bank ACH Dept Phone: 813-432-3700 (Service) | Tax ID: 94-3083515 |
| 813-432-3800 (Transmission) | Bank Wire Dept Phone: 877-204-1123 (opt 1) |

4. Cancellation Fees: _____

| Notice Time | Payment Penalty |
|---|---|
| More than 21 Days from Departure | 25% of the charter cost |
| Between 7 and 21 Days from Departure | 50% of the charter cost |
| Between 3 and 7 Days from Departure | 75% of the charter cost |
| 3 or Less Days from Departure | 100% of the charter cost |

SCS's right to such cancellation fees shall not limit any other remedies SCS may have at law or in equity, for damages based on such termination or cancellation.

Date: 4/9/2020
Name: JASON Armstrong
Initial: JAC



# UPS Supply Chain Solutions
# Charter Quote

Date of Quote:
8 April 2020

## Availability

| | |
|---|---|
| Origin: | HKG |
| Destination: | LCK |
| Dates: | TBA |
| Aircraft: | B747-400F |
| Payload (KGs): | 100,000 |
| Estimated Sell Rate: | USD 1,075,000 |

## Inclusions ✓

Aircraft Handling Charges
Airport to Airport, including load/offload
Cargo build / Cargo break

## Exclusions ✗

Origin Pickup Fees
Destination Delivery Fees
Non-Objection Fees, Royalties
Cargo Acceptance Fees
Any additional loading & un-loading equipment – *i.e. Crane, Large Forklift, etc.*
Shoring an Frangible Material
De-Icing, FET
512b Charges, warehouse fees
Terminal Fees
Customs Fees
War risk Insurance

## Operations Subject to:

On-going aircraft availability
Load-ability of the Cargo
Traffic Rights & Over-flight Permits
Cargo being suitably packed for airfreight
Fuel & Insurance Cost Fluctuations
Signed UPS SCS Charter Contract
Payment in full before departure

*All pricing and availability is subject to change, this is an indication without obligation.*



© 2020 United Parcel Service of America, Inc. UPS, the UPS brandmark and the color brown are trademarks of United Parcel Service America, Inc. All rights reserved.