**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| UPS SUPPLY CHAIN SOLUTIONS, INC., a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 1:20-cv-03408-JPB |
| v. | ) ) | |
| FOAM DEPOT, INC., a New York Corporation, | ) ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |

**FOAM DEPOT, INC.'S
AFFIRMATIVE DEFENSES, ANSWER, AND COUNTERCLAIM
TO COMPLAINT**

**COMES NOW**, Defendant Foam Depot, Inc., a New York Corporation ("FDI"), by and through its undersigned counsel of record, and pursuant to Federal Rules of Civil Procedure 8 and 12, and the applicable Local Rules of the United States District Court for the Northern District of Georgia, hereby files and serves its Affirmative Defenses, Answer, and Counterclaim to Plaintiff UPS Supply Chain Solutions, Inc., a Delaware Corporation's ("UPS-SCS") Complaint, stating as follows:

**DENIAL**

The Complaint filed by UPS-SCS fails to state a claim for which relief may be granted against FDI and should be dismissed with prejudice.

1

## AFFIRMATIVE DEFENSES

FDI, without assuming any burdens of proof, asserts the following Affirmative Defenses to UPS-SCS's Complaint:

1.

The Complaint fails to state a claim for which relief may be granted against FDI.

2.

UPS-SCS's claims against FDI are barred by impossibility of performance due to the Coronavirus/COVID-19 Pandemic.

3.

UPS-SCS's claims against FDI are barred as UPS-SCS breached the Global Air Charter Services Agreement entered into between the parties regarding the shipment of certain personal protective equipment by charted aircraft (B747-400F) for April 18, 2020 from Hong Kong International Airport to Anchorage International Airport and then to Rickenbacker International Airport in Columbus, Ohio.

4.

UPS-SCS'S claims against FDI are barred, at least in part, by the doctrine of estoppel.

5.

UPS-SCS's claims against FDI are barred, at least in part, by the doctrine of failure of consideration.

6.

UPS-SCS's claims against FDI are barred, at least in part, by the doctrine of laches.

7.

UPS-SCS's claims against FDI are barred, at least in part, by the doctrine of payment.

8.

UPS-SCS's claims against FDI are barred, at least in part, by the doctrine of set-off and/or recoupment.

9.

UPS-SCS's claims are barred, at least in part, by the doctrine of release.

10.

UPS-SCS's claims are barred, at least in part, by the doctrine of waiver.

11.

UPS-SCS's claims are barred, at least in part, by the doctrine of unclean hands.

12.

UPS-SCS's claims are barred, at least in part, because UPS-SCS has failed to mitigate its damages.

13.

UPS-SCS's claims are barred, at least in part, by UPS-SCS's failure to satisfy conditions precedent.

14.

FDI alleges each and every affirmative defense pursuant to Fed.R.Civ.P. 8(c) which may be applicable to the facts of this case as it may be disclosed by discovery and the evidence produced by the parties during these proceedings.

15.

FDI reserves its right to supplement and/or modify its Affirmative Defenses alleged in response to the Complaint.

## ANSWER

For its Sixteen Affirmative Defense and Answer, FDI responds to each and every averment contained in the Complaint and shows the following:

FDI denies the averments contained in the introductory Paragraph of the Complaint.

## INTRODUCTION

1.

FDI avers that the Global Air Charter Services Agreement (the "Agreement") attached to the Complaint as Exhibit A speaks for itself; to the extent the averments contained in Paragraph 1 of the Complaint or Exhibit "A" attached to the Complaint do not comport with the Agreement, FDI denies the Averments contained in Paragraph 1 of the Complaint. FDI denies the remainder of the averments contained in Paragraph 1 of the Complaint.

4

**PARTIES**

2.

FDI is without sufficient information or knowledge to answer the averments contained in Paragraph 2 of the Complaint; therefore, such averments are denied.


3.

FDI admits the averments contained in Paragraph 3 of the Complaint.

4.

FDI avers that Paragraph 4 of the Complaint constitutes a legal conclusion or statement by UPS-SCS to which no response is required. To the extent a response is required, FDI denies the averments contained in Paragraph 4 of the Complaint.

5.

FDI avers that the Agreement as it relates to venue speaks for itself; to the extent that the averments contained in Paragraph 5 of the Complaint do not comport with the Agreement, FDI denies the Averments contained in Paragraph 5 of the Complaint. FDI avers that the remainder of the averments contained in Paragraph 5 of the Complaint constitutes a legal conclusion or statement by UPS-SCS to which no response is required. To the extent a response is required, FDI denies the averments contained in Paragraph 5 of the Complaint.

6.

FDI avers that the Agreement as it relates to personal jurisdiction speaks for itself; to the extent that the averments contained in Paragraph 6 of the Complaint do not comport with the Agreement, FDI denies the Averments contained in Paragraph 6 of the Complaint.    FDI denies the remainder of the averments contained in Paragraph 6 of the Complaint.

**FACTS**

7.

FDI is without sufficient information or knowledge to answer the averments contained in Paragraph 7 of the Complaint; therefore, such averments are denied.

8.

FDI admits the averments contained in Paragraph 8 of the Complaint.

9.

FDI avers that the Agreement speaks for itself; to the extent that the averments contained in Paragraph 9 of the Complaint do not comport with the Agreement, FDI denies the Averments contained in Paragraph 9 of the Complaint.

10.

FDI avers that the Agreement speaks for itself; to the extent that the averments contained in Paragraph 10 of the Complaint do

not comport with the Agreement, FDI denies the Averments contained in Paragraph 10 of the Complaint.

11.

FDI avers that the Agreement and Exhibit A to the Agreement speak for themselves; to the extent that the averments contained in Paragraph 11 of the Complaint do not comport with the Agreement and Exhibit A to the Agreement, FDI denies the Averments contained in Paragraph 11 of the Complaint.

12.

FDI denies the averments contained in Paragraph 12 of the Complaint as pled.

13.

FDI avers that the Agreement speaks for itself; to the extent that the averments contained in Paragraph 13 of the Complaint do not comport with the Agreement, FDI denies the Averments contained in Paragraph 13 of the Complaint.

14.

FDI denies the averments contained in Paragraph 14 of the Complaint.

15.

FDI avers that the Agreement speaks for itself; to the extent that the averments contained in Paragraph 15 of the Complaint do not comport with the Agreement, FDI denies the Averments contained in Paragraph 15 of the Complaint.

15. [sic]

FDI denies the averments contained in Paragraph 15 of the Complaint.

16.

FDI denies the averments contained in Paragraph 16 of the Complaint.

17.

FDI avers that the Agreement speaks for itself; to the extent that the averments contained in Paragraph 17 of the Complaint do not comport with the Agreement, FDI denies the Averments contained in Paragraph 17 of the Complaint.

**COUNT ONE**

(Breach of Contract)

18.

FDI realleges and reasserts by this reference its responses to Paragraphs 2 – 3 and 7 – 17 as if fully set forth herein.

19.

FDI avers that the averments contained in Paragraph 19 of the Complaint constitutes a legal conclusion or statement by UPS-SCS to which no response is required.  To the extent a response is required, FDI denies the averments contained in Paragraph 19 of the Complaint.

20.

FDI avers that the Agreement and Exhibit A to the Agreement speak for themselves; to the extent that the averments contained in Paragraph 20 of the Complaint do not comport with the Agreement and Exhibit A to the Agreement, FDI denies the Averments contained in Paragraph 20 of the Complaint.

21.

FDI avers that Exhibit A to the Agreement speaks for itself; to the extent that the averments contained in Paragraph 21 of the Complaint do not comport with Exhibit A, FDI denies the Averments contained in Paragraph 21 of the Complaint.  FDI avers that the averments contained in Paragraph 21 of the Complaint also constitutes a legal conclusion or statement by UPS-SCS to which no response is required.  To the extent a response is required, FDI denies the averments contained in Paragraph 21 of the Complaint. FDI denies the remainder of the averments contained in Paragraph 21 of the Complaint.

22.

FDI denies the averments contained in Paragraph 22 of the Complaint.

23.

FDI denies the averments contained in Paragraph 23 of the Complaint.

24.

FDI denies the averments contained in Paragraph 24 of the Complaint.

**COUNT TWO**

(Attorneys' Fees and Expenses under O.C.G.A. § 13-6-11)

25.

FDI realleges and reasserts by this reference its responses to Paragraphs 2 – 3 and 7 – 17 as if fully set forth herein.

26.

FDI avers that the averments contained in Paragraph 26 of the Complaint constitutes a legal conclusion or statement by UPS-SCS to which no response is required.  To the extent a response is required, FDI denies the averments contained in Paragraph 26 of the Complaint.

27.

FDI denies the averments contained in Paragraph 27 of the Complaint.

28.

FDI denies the averments contained in Paragraph 28 of the Complaint.

29.

FDI denies the averments contained in Paragraph 29 of the Complaint.

<u>Demand for Jury Trial</u>

A "Demand for Jury Trial" is included following Paragraph 29 of the Complaint to which no response is required by FDI.  To the extent a response is required, FDI denies the averments contained in the "Demand for Jury Trial" as contained following Paragraph 29 of the Complaint.

A "Wherefore" clause is also included after the "Demand for Jury Trial" with FDI also denying the averments and prayer for relief contained in the "Wherefore" clause with FDI responding to the subparts as follows:

(1)  FDI denies the averments contained subpart (1) of the "Wherefore" clause following the "Demand for Jury Trial" of the Complaint;

(2)  FDI denies the averments contained subpart (2) of the "Wherefore" clause following the "Demand for Jury Trial" of the Complaint;

(3)  FDI denies the averments contained subpart (3) of the "Wherefore" clause following the "Demand for Jury Trial" of the Complaint;

(4)  FDI denies the averments contained subpart (4) of the "Wherefore" clause following the "Demand for Jury Trial" of the Complaint;

(5)  FDI denies the averments contained subpart (5) of the "Wherefore" clause following the "Demand for Jury Trial" of the Complaint; and

(6)  FDI denies the averments contained in subpart (6) of the "Wherefore" clause following the "Demand for Jury Trial" of the Complaint.

30.

FDI denies any other averments not already specifically addressed in this Answer. Except as expressly admitted herein, all averments of the Complaint are denied.

**WHEREFORE**, FDI respectfully requests the following relief:

(a)  That UPS-SCS's counts and claims in the Complaint be dismissed with prejudice;

(b)  That FDI have a trial by jury on all claims in this action;

(c)  That FDI be awarded its reasonable attorneys' fees and costs of litigation in connection with this action; and

(d)  That FDI be awarded such further and other relief as may be deemed appropriate by this Court.

<b><u>COUNTERCLAIM</u></b>

**COMES NOW**, Defendant/Counterclaim Plaintiff Foam Depot, Inc., a New York Corporation ("FDI"), by and through its undersigned counsel of record, and hereby files its Counterclaim against Plaintiffs/Counterclaim Defendant UPS Supply Chain Solutions,

12

Inc., a Delaware Corporation ("UPS-SCS") showing this Court as follows:

## PARTIES, JURISDICTION, AND VENUE

1.

FDI is a New York business corporation organized and existing under the laws of the State of New York, with its principal executive office being located at 495 Aero Road, Suite 1, Cheektowaga, New York 14225. FDI is a supplier of personal protective equipment ("PPE"), including but not limited to face masks, gloves, gowns, overalls, goggles, spray foam and ThermaPlates.

2.

Based on information and belief, UPS-SCS is a Delaware corporation with its principal place of business being located at 12380 Morris Road, Alpharetta, Georgia 30005. UPS-SCS can be served with process by service on its registered agent, CDC of Cobb County, Inc. at 192 Anderson Street, SE, Suite 125, Marietta, Cobb County, Georgia 30060, or upon its counsel of record.

3.

This Court has subject matter jurisdiction over this Counterclaim under 28 U.S.C.A. § 1332(a)(1) because FDI and UPS-SCS are citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4.

This Court has personal jurisdiction over UPS-SCS as UPS-SCS consented to the jurisdiction of this Court in the Global Air Charter Services Agreement ("Agreement") entered into with FDI which is the subject matter of this action; with the parties entering into the Agreement in Fulton, County, Georgia; and UPS-SCS transacting business in Fulton County, Georgia. The exercise of jurisdiction over the parties will not violate due process because UPS-SCS claims to have been entitled to receive payment from FDI in Fulton County, Georgia whereby UPS-SCS should have reasonably anticipated defending suit in this Court.

5.

Venue is proper in this District under 28 U.S.C.A. § 1391(b)(1) and (2) as UPS-SCS resides in Fulton County, Georgia with a substantial part of the events or omissions giving rise to UPS-SCS's and FDI's claims against each other occurring in this District with the parties consent to venue to Fulton County, Georgia in the Agreement.

**FACTUAL BACKGROUND**

6.

On or about April 9, 2020, FDI entered into the Agreement with UPS-SCS for UPS-SCS to provide a chartered aircraft (B747-400F) to ship PPE or 100,000 kgs of gloves on April 18, 2020 from Hong Kong International Airport to Anchorage International Airport

14

and then to Rickenbacker International Airport in Columbus, Ohio in response to the Coronavirus/COVID-19 Pandemic. A true and correct copy of the Agreement is attached hereto and is incorporated herein by reference as **Exhibit 1**.

7.

Upon information and belief, UPS-SCS is a wholly owned subsidiary and branch of United Parcel Service, Inc. ("UPS"), as seen by all employees of UPS-SCS using the "@ups.com" domain for their e-mail addressed.

8.

FDI has regularly used UPS and its subsidiaries for shipments both domestically and abroad.

9.

On or about April 7, 2020, FDI contacted UPS to arrange for a shipment from Shenzhen, China to Buffalo, New York, USA.

10.

UPS notified UPS-SCS of the shipment request from FDI seeking to transport the PPE consisting of 22,000 boxes of nitrile gloves, weighing approximately 308,000 pounds from Shenzhen, China to Buffalo, New York, USA.

11.

On April 8, 2020, UPS and UPS-SCS provided a quote to transport the product from Hong Kong to Columbus Ohio with UPS providing transportation of the PPE from Shenzhen to Hong Kong.

12.

On April 8, 2020, UPS and UPS-SCS discussed several issues regarding the shipment directly, including shipping dates, payload fit of 308,000 pounds, and a door-to-door quote for the shipment.

13.

On the same day, UPS informed UPS-SCS of FDI's requirement to have the PPE delivered to New York City by April 21, 2020, as the COVID-19 pandemic was devastating New York City at the time.

14.

On April 9, 2020, UPS-SCS provided UPS with one flight option leaving Hong Kong on April 18, 2020 and arriving in Columbus, Ohio on April 19, 2020.

15.

UPS and UPS-SCS agreed to assist with the coordination of the trucking from Columbus, Ohio to New York City to ensure meeting the April 21, 2020 deadline.

16.

On April 9, 2020, UPS contacted FDI and requested that FDI approve the charter flight based on the representation that the PPE would arrive in New York City before April 21, 2020.

17.

Based on the representations from UPS and UPS-SCS, FDI agreed to "lock in" the charter flight.

18.

UPS-SCS stated that upon agreement to schedule the charter flight, the contract process would start.

19.

UPS-SCS informed FDI that it would not confirm the charter flight until the Agreement was signed.

20.

At UPS-SCS and UPS's urging, FDI signed the Agreement on April 9, 2020 at approximately 10:42 p.m. Eastern Daylight Time ("EDT").

21.

On April 10, 2020, at approximately 5:50 a.m. EDT, FDI was informed that UPS was not permitted by the Chinese government to move goods from Shenzhen, China to Hong Kong.

22.

Prior to FDI signing the Agreement and as early as April 2, 2020, UPS and UPS-SCS knew or should have known that there were significant disruptions in the supply chain and that UPS's ability to transport items from mainland China due to the Coronavirus/COVID-19 Pandemic had been interrupted.

23.

Neither UPS nor UPS-SCS informed FDI of these disruptions and instead, actively encouraged FDI to execute the Agreement.

24.

UPS suspended its Service Guarantee prior to the date for delivery of the PPE in apparent response to these disruptions.

25.

On April 10, 2020, at approximately 5:50 a.m. EDT, FDI contacted UPS-SCS and informed them that UPS was not able to transport the PPE from mainland China to Hong Kong. In addition, UPS-SCS informed FDI that if the PPE were somehow delivered to Hong Kong, it would not be allowed to leave Hong Kong in a timely manner.

26.

Following the conversation with FDI, UPS-SCS researched its ability to transport the PPE. UPS-SCS ultimately confirmed with FDI in a telephone call that both UPS and UPS-SCS transportation operations had been shut down by the Hong Kong government.

27.

On April 14, 2020, FDI and UPS-SCS had a telephone call regarding cancellation of the charter due to the inability of UPS and UPS-SCS to perform.

28.

In the same telephone call, UPS-SCS recommended that FDI cancel the Agreement for the charter, with FDI inquiring whether UPS or UPS-SCS could arrange a flight departing from a location other than Hong Kong.

29.

On April 14, 2020, UPS-SCS cancelled the charter flight and informed FDI that it owed a penalty of $806,250 with an unknown amount to be credited after UPS-SCS mitigated the loss.

30.

On April 15, 2020, UPS-SCS informed FDI that the penalty could be reduced to $525,000.

31.

On April 17, 2020, FDI requested documents supporting the amount of the penalty and informed UPS-SCS that it needed the documentation to try to pass any legitimate costs through to its end-use customer.

32.

UPS-SCS refused to furnish any documentation to FDI supporting the claimed penalty.

33.

As a result of UPS's and UPS-SCS's inability to transport the PPE or inform FDI of their inability to transport the PPE from Shenzhen China to Hong Kong and from Hong Kong to the United States, FDI made other arrangements to secure transportation of PPE to New York City.

34.

The cost to cover the transportation of the PPE that UPS and UPS-SCS failed to deliver was $2,009,000.

35.

As a result of UPS-SCS's actions in enticing FDI into a contract that neither UPS-SCS nor UPS could perform, FDI incurred $934,000 in damages trying to cover the delivery costs of the PPE order.

36.

All conditions precedent to the bringing of this Counterclaim and the enforcement of the Agreement which is subject thereof have been performed, excused, or waived.

**COUNT I**
**ACTION FOR BREACH OF CONTRACT**

37.

FDI incorporates herein by reference all allegations contained in Paragraphs 1 through 36 of this Counterclaim and reiterates all of those allegations.

38.

FDI and UPS-SCS entered into the Agreement for UPS-SCS to provide a charted aircraft to ship 100,000 kgs of gloves from Hong Kong International Airport to Anchorage International Airport and from there to Rickenbacker International Airport in Columbus,

Ohio where FDI planned for its delivery ultimately to New York City in response to the Coronavirus/COVID-19 Pandemic.

39.

The Agreement is a valid and enforceable contract existing between the parties.

40.

The Agreement provides in Exhibit A, Section A.2 that UPS-SCS will deliver the PPE to Rickenbacker International Airport in Columbus, Ohio at approximately 3:45 a.m. on April 19, 2020. (See **Exhibit 1**).

41.

The Agreement further provides that UPS-SCS will deliver the PPE to Columbus, Ohio for the fee of $1,075,000.

42.

UPS-SCS breached the Agreement.

43.

UPS-SCS failed and refused to deliver the PPE as required by the Agreement because its corporate parent, UPS, failed and refused to deliver the PPE from Shenzhen, China to Hong Kong.

44.

As a result of the failure of UPS-SCS to deliver the PPE as promised, FDI was required to secure alternative transportation for the PPE at an additional cost of $934,000.

45.

UPS-SCS's breach of contract has proximately caused damage to FDI totaling $934,000 in the principal sum.

46.

FDI is the party which has the right to complain about the Agreement or contract being breached or broken by UPS-SCS.

47.

UPS-SCS is liable to FDI for the principal amount of at least $934,000 resulting from UPS-SCS's performance failures associated with the charted aircraft to deliver the gloves from Hong Kong to Anchorage and then to Columbus.

48.

FDI demanded payment of the $934,000 from UPS-SCS on April 28, 2020 as indicated in the Invoice attached as **Exhibit 2**.

49.

UPS-SCS is also liable to FDI for prejudgment interest on the principal amount of $934,000 at the rate of 7% per annum from April 28, 2020 to the date of judgment in this action pursuant to O.C.G.A. § 7-4-2.

**WHEREFORE**, FDI respectfully requests that this Court enter judgment in favor of FDI and against UPS-SCS for breach of contract as follows:

(a)  the principal amount of $934,000; plus

(b)    prejudgment interest on the principal amount of $934,000 at the rate of 7% per annum from April 28, 2020 to the date of judgment in this action pursuant to O.C.G.A. § 7-4-2; plus

(c)    all costs of this action; plus

(d)    such other and further relief as this Court deems just and proper.

## COUNT II
## ACTION FOR FRAUDULENT INDUCEMENT

50.

FDI incorporates herein by reference the allegations contained in Paragraphs 1 through 36 of this Counterclaim and reiterates all of those allegations.

51.

UPS-SCS made false representations of material facts to FDI when it represented, in conjunction with UPS, that the PPE could be shipped from Shenzhen, China by UPS, with subsequent departure from Hong Kong to the United States.

52.

UPS-SCS made these false representations with actual knowledge that they were false at the time they were made and with the express intention that such representation would induce FDI into signing the Agreement with UPS-SCS.

23

53.

UPS-SCS had prior knowledge of the disruption in moving the PPE from Shenzhen, China to Hong Kong and with shipping the PPE from Hong Kong to the United States.

54.

FDI did not know of the disruptions in the supply chain affecting delivery of the PPE.

55.

FDI justifiably relied upon the representations made by UPS-SCS regarding its ability to ship the PPE and signed the Agreement in reliance upon those representations.

56.

FDI's reliance was to its detriment in that UPS-SCS could not fulfill its obligations under the Agreement, the PPE did not arrive in the United States as intended, FDI spent considerably more money to transport the PPE, and FDI has been sued for damages by UPS-SCS in this matter.

57.

FDI has incurred damages as a result of being fraudulently induced into signing the Agreement in that UPS-SCS could not fulfill its obligations under the Agreement, the PPE did not arrive in the United States as intended, FDI spent considerably more money to transport the PPE, and FDI has been sued for damages by UPS-SCS in this matter.

24

**WHEREFORE**, FDI respectfully requests that this Court enter judgment in favor of FDI and against UPS-SCS for fraudulent inducement as follows:

(a)   the principal amount of $934,000; plus

(b)   prejudgment interest on the principal amount of $934,000 at the rate of 7% per annum from April 28, 2020 to the date of judgment in this action pursuant to O.C.G.A. § 7-4-2; plus

(c)   all costs of this action; plus

(d)   such other and further relief as this Court deems just and proper.

In the alternative, FDI requests that the Court rescind the Agreement and order UPS-SCS to pay all damages incurred by FDI in entering into the Agreement based upon the fraudulent inducement of UPS-SCS.

## COUNT III IN THE ALTERNATIVE ACTION FOR NEGLIGENT INDUCEMENT

58.

FDI incorporates herein by reference all allegations contained in Paragraphs 1 through 49 of this Counterclaim and reiterates all of those allegations.

59.

UPS-SCS made false representations of material facts to FDI when it represented, in conjunction with UPS, that the PPE could

25

be shipped from Shenzhen, China by UPS, with subsequent departure from Hong Kong to the United States.

60.

UPS-SCS made these false representations with, at a minimum, reckless disregard for their veracity and with the express intention that such representation would induce FDI into signing the Agreement with UPS-SCS.

61.

UPS-SCS had prior knowledge of the disruption in moving the PPE from Shenzhen, China to Hong Kong and with shipping the PPE from Hong Kong to the United States.

62.

FDI did not know of the disruptions in the supply chain affecting delivery of the PPE.

63.

FDI justifiably relied upon the representations made by UPS-SCS.

64.

FDI's reliance was to its detriment in that the PPE did not arrive in the United States as intended, FDI spent considerably more money to transport the PPE, and FDI has been sued for damages by UPS-SCS in this matter.

26

65.

FDI has incurred damages as a result of being negligently induced into signing the Agreement in that the PPE did not arrive in the United States as intended, FDI spent considerably more money to transport the PPE, and FDI has been sued for damages by UPS-SCS in this matter.

**WHEREFORE**, FDI respectfully requests that this Court enter judgment in favor of FDI and against UPS-SCS for negligent inducement as follows:

(a)  the principal amount of $934,000; plus

(b)  prejudgment interest on the principal amount of $934,000 at the rate of 7% per annum from April 28, 2020 to the date of judgment in this action pursuant to O.C.G.A. § 7-4-2; plus

(c)  all costs of this action; plus

(d)  such other and further relief as this Court deems just and proper.

In the alternative, FDI requests that the Court rescind the Agreement and order UPS-SCS to pay all damages incurred by FDI in entering into the Agreement based upon the negligent inducement of UPS-SCS.

## COUNT IV
## ACTION FOR ATTORNEYS' FEES AND EXPENSES
## UNDER O.C.G.A. § 13-6-11

66.

FDI incorporates herein by reference all allegations contained in Paragraphs 1 through 65 of this Counterclaim and reiterates all of those allegations.

67.

Pursuant to O.C.G.A. § 13-6-11, "where the defendant has acted in bad faith, has been stubbornly litigious or has caused the plaintiff unnecessary trouble and expense", the jury may allow the recovery of the expenses of litigation, including reasonable attorneys' fees and expenses.

68.

FDI is the plaintiff in this counterclaim.

69.

UPS-SCS induced FDI into entering into the Agreement on false premises, knowing that the terms of the Agreement could not be fulfilled, and then demanded that FDI pay a penalty of $806,250.

70.

FDI requested documentation of the expenses purportedly incurred by UPS-SCS in order to understand the claimed penalty and attempt to pass any legitimate charges to its end-use customer. UPS-SCS failed and refused to furnish the requested information.

71.

By its conduct, UPS-SCS has acted in bad faith, has been stubbornly litigious, and has caused UPS-SCS unnecessary trouble and expense.

72.

Accordingly, pursuant to O.C.G.A. § 13-6-11, UPS-SCS is liable to FDI for the expenses of litigation, including reasonable attorneys' fees and expenses.

**WHEREFORE**, FDI respectfully requests that this Court enter judgment in favor of FDI and against UPS-SCS for negligent inducement as follows:

(a)   the principal amount of $934,000; plus

(b)   prejudgment interest on the principal amount of $934,000 at the rate of 7% per annum from April 28, 2020 to the date of judgment in this action pursuant to O.C.G.A. § 7-4-2; plus

(c)   attorneys' fees and expenses; plus

(d)   all costs of this action; plus

(e)   such other and further relief as this Court deems just and proper.

In the alternative, FDI requests that the Court rescind the Agreement and order UPS-SCS to pay all damages incurred by FDI in entering into the Agreement based upon the negligent inducement of UPS-SCS.

29

Respectfully submitted

**SMITH, CURRIE & HANCOCK LLP**

*/s/ Joseph J. Dinardo*

Joseph J. Dinardo
Georgia Bar Number: 302914

*/s/ Stephen M. Reams*

Stephen M. Reams
Georgia Bar Number: 597165

***Attorneys for Defendant/
Counterclaim Plaintiff Foam Depot,
Inc.***

2700 Marquis One Tower
245 Peachtree Center Avenue, NE
Atlanta, Georgia 30303-1227
Telephone: (404) 521-3800
Facsimile: (404) 688-0671
jjdinardo@smithcurrie.com
smreams@smithcurrie.com

# Exhibit 1



## GLOBAL AIR CHARTER SERVICES AGREEMENT
## UPS SUPPLY CHAIN SOLUTIONS, INC.

This Global Air Charter Services Agreement ("Agreement") is entered into this 9 day of April, 2020 (the "Effective Date"), by and between Foam Depot Inc, with offices located at 495 Aero Drive, Cheektowaga, NY 14225 ("Customer") and as indicated on the signature page of this Agreement, **UPS Supply Chain Solutions, Inc.**, with respect to Services provided in the Americas region ("UPS SCS"), UPS SCS, Inc. with respect to Services provided in the Canada region ("UPS SCS Canada"), UPS Europe SPRL with respect to Services provided in Europe, Middle East and Africa Region ("UPS SCS Europe"), and UPS Asia Group Pte. Ltd. with respect to services provided in the Asia-Pacific region ("UPS SCS Asia").

UPS SCS, UPS SCS Canada, UPS SCS Europe and UPS SCS Asia shall each be known as "SCS" as such term is used in the Agreement, but solely with respect to the Services provided in their respective regions. The term "SCS" also may include other subsidiaries and affiliate companies and joint venture companies of UPS SCS, UPS SCS Canada, UPS SCS Europe and UPS SCS Asia as UPS SCS, UPS SCS Canada, UPS SCS Europe or UPS SCS Asia may designate, but only with respect to the scope of Services provided by such subsidiary or affiliate or joint venture company. Customer and SCS are each a "Party" and collectively the "Parties".

### I.    Air Charter Services

SCS shall, on behalf of Customer, charter one or more aircraft from a third party carrier (the "Carrier") for purposes of transporting Customer's goods ("Goods") from origin airport to destination airport only, in accordance with the terms set forth in this Agreement, including its Exhibit A ("the Services"). Except as otherwise provided in Exhibit A, the Services do not include any other service related to the Goods, such as customs clearance, storage, or final delivery.

### II.    Charter Fees and Charges; Payment Terms

      A.    In consideration of the Services provided hereunder, Customer shall pay SCS the aircraft charter fees ("Charter Fees") and other charges specified in Exhibit A.

      B.    Except as otherwise provided in Exhibit A, Charter Fees shall be due and payable upon execution of this Agreement. SCS reserves the right to decline to provide Services and any outstanding charter flights shall not depart if Customer fails to pay the Charter Fees as required. For all additional charges due to SCS, SCS shall invoice Customer with payment due as set forth in the invoice. Any unpaid balance outstanding for more than fifteen (15) days shall accrue interest at the rate of one and one half percent (1.5%) per month calculated from the due date of such invoice.

      C.    Except as otherwise provided in Exhibit A, the Charter Fees do not include additional applicable charges including, without limitation, fuel surcharges, landing rights, airport taxes and airport usage fees, detention charges, de-icing charges, charges for ground transportation, loading or unloading, storage, or palletizing services, other origin and destination charges, security and war risk fees, potential royalty and non-objection fees. Charter Fees also do not include special expense items (such as cargo skidding, shoring, dunnage, protective coverings) or special handling equipment fees (such as for cranes, heavy-duty forklifts, horizontal jibs, flatbed trucks and similar items), and such special expense items or special handling equipment shall be furnished and paid for by Customer.

      D.    Customer shall pay, and shall indemnify and hold SCS harmless from, all taxes, duties and levies directly imposed by all foreign, federal, state, local or other taxing authorities (including, without limitation, export, sales, use, excise, and value-added taxes) based on the transactions or payments under this Agreement, other than taxes imposed or based on SCS's net income. SCS may advance such payments as may be required for the protection or advancement of the aircraft, crew, passengers or the Goods. Customer shall reimburse SCS for any such payments in accordance with this Section.

      E.    The Charter Fees and other commercial terms contained in this Agreement are confidential to the Parties and may not be disclosed to third parties without prior approval.

### III.    Insurance

Customer shall be solely responsible for insuring Goods against all risk of loss, including theft or damage, if such insurance is desired. SCS assumes no responsibility to effect insurance unless it has expressly agreed to in writing, and SCS does not represent or warrant that such insurance can be placed.

### IV.    Security Endorsement; Hazardous Material Indemnity

      A.    Customer acknowledges and agrees that in providing the Services hereunder, SCS will rely on the correctness and completeness of all documentation relating to the Goods, including dangerous goods, dangerous cargo or security risk shipments (collectively "Dangerous Goods") furnished by Customer, whether such documentation is in written or electronic format.



B.    Customer warrants, covenants and agrees that Customer has an affirmative, non-delegable duty to disclose to SCS any and all information necessary to provide the Services in full compliance with applicable law.  Customer further warrants, covenants and agrees that it will not tender or cause to be tendered or presented to SCS any Goods or Dangerous Goods not in full conformity with applicable law, and that it will comply with and ensure that all Goods (and any passenger) carried under this Agreement shall comply with all applicable laws and regulations of any country or state to, from, or over which the aircraft is to be flown on any flight, including without limitation those relating to the carriage of Dangerous Goods, live animals, and security or protection against terrorism.

C.    Customer hereby agrees to indemnify, defend and hold harmless SCS, and its successors, parent, and affiliate corporations, and their officers, shareholders, directors, board members and employees from and against any and all claims, liabilities, fines, penalties, damages, costs and expenses (including reasonable attorneys' fees) arising out of or relating to Customer's breach of any of its obligations under this Section.

**V.    General Terms Relating to the Goods**

A.    Prior to the commencement of the Services, Customer shall furnish SCS with a declaration setting forth the complete description and weight of all Goods to be transported.  Customer shall provide SCS with all necessary information, in sufficient time, to allow compliance with U.S. Customs and Border Protection Automated Export System (AES) / Automated Manifesting System (AMS) and FDA requirements.  Customer agrees to provide when requested the commodity, declared value and Schedule B number of all Goods.  Customer shall disclose, upon execution of this Agreement, any Goods that are licensable from the US Department of Commerce or US Department of State and provide all details including, but not limited to, the license number or if any exemptions or exceptions apply.

B.    Customer shall ensure that Goods are properly packed and labeled to insure safe transportation by ordinary handling, and any Goods susceptible to damage by ordinary handling must be adequately protected by proper packing and must be marked or bear appropriate warning labels.  SCS has the right, but not the obligation, to inspect all Goods.

C.    SCS retains the right to refuse carriage of Goods or other cargo that:  (a) is improperly packed or packaged, (b) cannot be reasonably loaded within the cube capacity of the aircraft or exceed the operational weight limitation of the aircraft, (c) is of such nature or have such defect as to indicate to SCS in its sole discretion that such transportation could not be furnished by SCS without loss of or damage to the Goods or aircraft, or without endangering the safety of a flight, the crew or any passengers, (d) is not suitable for carriage on aircraft, or (e) cannot be transported in accordance with the provisions herein or in accordance with applicable tariffs, laws or other domestic or foreign governmental rules and regulations.  Such right on the part of SCS shall not relieve Customer of responsibility for proper preparation, protection, packing and marking of the Goods or impose on SCS any liability for loss or damage resulting from Customer's breach of such responsibility or from the nature of or any defect in the Goods.

D.    SCS may return rejected Goods to Customer or its agent at the airport of origin at Customer's expense.  Alternatively, SCS may abandon and/or release, after reasonable notice to Customer, any Goods which SCS has refused for carriage in accordance with this Section or which Customer has undervalued for customs purposes or misdescribed, whether intentional or otherwise, without incurring any liability whatsoever to Customer.  Customer shall defend, indemnify and hold SCS harmless from all claims, damages, fines and expenses arising therefrom.

E.    Any Goods accepted by SCS at Customer's Load and Count ("CLC") in sealed containers shall be delivered by SCS with the original seal.  SCS shall not be liable for any damages, losses or claims with respect to any Goods accepted by SCS at the CLC in sealed containers when SCS delivers such Goods in the original containers with the original seal, and Customer hereby unconditionally releases SCS from any such damages, losses or claims.

F.    Customs clearance is the responsibility of Customer and/or consignee, and not SCS.

G.    Customer certifies that no new or used coniferous (pine/spruce/fir) non-manufactured wood packing materials originating in the United States, Canada, China or Japan are used on any flight destined for any country in the European Union, unless treated and marked in accordance with U.S. Department of Agriculture and American Lumber Standard Committee guidelines or otherwise in compliance with all applicable European Union regulations.  Customer agrees to reimburse SCS for, and indemnify and hold harmless SCS from and against, any claims, additional expenses (including attorneys' fees), special, incidental, consequential or other damages or costs incurred or alleged to have occurred as a result of Customer's non-compliance.  Additional details concerning limitations on the use of non-manufactured wood packing materials in the European Union can be found at www.aphis.usda.gov/ppq/swp/eunmwp.html.

H.    Customer has responsibility for, and warrants its compliance with, all applicable laws, rules and regulations, including, but not limited to, customs laws, import and export laws, and government regulations of any country to, from, through or over which its shipment may be carried, and that all Goods tendered for Service comply with such applicable laws.



## VI.    Operations and Performance of Services

A.    The performance of the Services is subject to the receipt of consents and/or approvals of domestic and foreign governments, including, but not limited to, the timely granting of all takeoff, landing (including technical stops) and overfly rights, required to operate the flights. Customer agrees to comply with the formalities required by all domestic or foreign administrative authorities at the place of origin, destination or elsewhere.

B.    Customer shall observe all operating rules and regulations of SCS and Carrier and comply with all reasonable instructions of the employees and agents of SCS or Carrier. The aircraft and its crew shall at all times be under the exclusive command and control of the pilot-in-command, whose orders shall be strictly complied with by Customer and all passengers.

C.    Departure times and flight routes shall be established by SCS and are subject to and may be altered by aircraft or crew availability, aircraft routing, gate space, airport handling ability, weather conditions, fuel stops, and other operational factors. Each party shall use commercially reasonable efforts to cause on-time departures. Notwithstanding the foregoing and the Charter flight details set forth on Exhibit A, SCS shall not be liable for the failure of a flight to depart or arrive according to any predetermined time, schedule or route. There are no stopping places which are agreed at the time of tender of Goods and SCS reserves the right without notice to route Goods in any way deemed appropriate, and/or to substitute alternative aircraft and/or Carrier for all flights, without penalty to SCS. SCS also reserves the right to consolidate two or more shipments of Goods on one aircraft.

D.    In case of mechanical difficulties, damage to aircraft, unsafe conditions, adverse weather conditions, requirements of law, or other circumstances, the charter flight may be cancelled or delayed at the point of origin or at any other point, or any point on the itinerary may be omitted or changed. In such event, SCS may take whatever steps it deems necessary for the protection of itself and any other parties, including sending collect communications for instructions, disposing of perishable Goods without instructions (with the proceeds from the sale of such perishable Goods paid to SCS for any monies due), or tendering Goods for onward carriage by other carriers to the destination airport. In the event of the cessation or delay of the flight for any of the above reasons, Customer agrees that SCS shall be entitled to payment of the Charter Fees, or a prorated share of the Charter Fees, in accordance with the Services performed. Charter Fees are not open to negotiation or concession after the fact due to service failures beyond the control of SCS.

E.    Customer shall be responsible for demurrage charges incurred for layovers in excess of permitted maximums at point of origin and destination and traffic stops for loading and unloading the Goods and customs clearance, or for any delays caused by, or which are the responsibility of Customer including, without limitation, unavailability of Goods for loading at specified times; inadequate packaging; delay in receipt of operational permits when the responsibility of Customer; delayed, inadequate or unacceptable customs documentation and other paperwork; delay in customs clearance for any reason caused by Customer; delay in loading and unloading the Goods when the responsibility of Customer; and any consequential delays resulting therefrom.

F.    In the event that any space available to the Customer shall not be utilized by Customer, Customer consents to the use by SCS of such space, without refund or reduction of the Fees, for the transport of SCS's personnel and property to the extent authorized by prevailing U.S. Department of Transportation regulations.

G.    Except as specifically set forth herein, SCS makes no express or implied warranties in connection with its Services.

## VII.    Liability

SCS'S LIABILITY SHALL BE LIMITED ACCORDING TO THE FOLLOWING:

A.    Except as specifically provided otherwise, loading and unloading of Goods shall be at the sole risk of Customer and SCS shall have no liability whatsoever to Customer for loss or damage arising from loading and unloading of Goods.

B.    If this shipment involves international carriage, the (i) Convention for the Unification of Certain Rules Relating to the International Carriage by Air, signed at Warsaw on 12 October, 1929; (ii) that convention as amended or supplemented by any protocol or supplementary convention; or (iii) the Convention for the Unification of Certain Rules for International Carriage by Air (Montreal, 28 May 1999) (each a "Convention"), may apply and limits SCS's liability for loss, damage, or delay to Goods.

C.    Except where a Convention mandatorily applies and provides otherwise, SCS's liability for loss or damage to Goods shall be limited to the higher of fifty dollars ($50) (USD) per shipment or fifty cents ($.50) (USD) per pound of Goods lost or damaged. Customer and SCS agree that they have negotiated a reasonable limit of liability under the circumstances surrounding the transportation, the value of the Goods, and the Parties' respective business interests and rates charged. Customer acknowledges that SCS agrees to provide services to Customer under these negotiated rates and terms based on Customer's agreement that SCS's liability shall be limited as set forth in this Agreement. Customer expressly waives any right it may have to declare a value for the Goods, or to file a claim against SCS for loss or damage to the Goods in excess of these



amounts. In no event shall SCS be liable for any damages or penalties of any kind arising from delayed Services, delayed departure or arrival, delayed delivery or failure to deliver within a specific time, or any special, incidental, or consequential damages.

D.    Without limiting the generality of Paragraph C, SCS shall not be liable for any loss or damage, delay or failure to perform Services caused in whole or in part by (i) the act or omission of Customer, consignee, or any other party claiming an interest in the Goods, (ii) the nature, defect or inherent vice of the Goods (including inadequate packaging), (iii) failure of Customer to observe any requirements or obligations in this Agreement, (iv) Acts of God, weather conditions, environmental or dangerous goods incidents, perils of the air, public enemies, public authorities acting with actual or apparent authority, acts or omissions of custom officials, authority of law, quarantine, riots, strikes, work stoppages or slowdowns, or other labor disputes or disturbances, local or national disruptions in ground or air transportation networks or systems due to events beyond SCS's control, disruption or failure of communication and information systems, disruption or failure of utilities, civil commotions or hazards incident to a state of war, mechanical delay of aircraft or other equipment failures on all international shipments, or (v) any other circumstances beyond SCS's control.

E.    It is hereby expressly agreed that the Carrier, including without limitation a Carrier that is a parent corporation, indirect or direct subsidiary, or affiliate of SCS, shall not in any circumstances whatsoever be under any liability whatsoever to Customer for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on its part while providing Services and, without prejudice to the generality of the foregoing, every limitation, exemption from liability, defense and immunity of whatsoever nature applicable to SCS, including as set forth in Paragraph C and D, above, shall also be available and shall extend to protect every such Carrier.

## VIII.    Claims

Except to the extent that international convention rules or other applicable mandatory laws apply and provide otherwise, all claims against SCS arising from or related to the Services shall be made in writing and received by SCS within 15 calendar days following the date on which the Goods were or should have been delivered. Any action for loss or damage arising from a shipment shall be commenced within one (1) year from the date on which the Goods were or should have been delivered. Any claims, including, but not limited to, demands for damages, refunds, credits, and any legal or equitable relief whatsoever, shall be extinguished unless the Customer or claimant timely and completely complies with all applicable notice and claims requirements and periods set forth in this Agreement.

## IX.    Indemnification

Customer hereby agrees to indemnify, defend and hold harmless SCS and its successors, parent corporations, subsidiary corporations and their officers, shareholders, directors, and employees, from and against any and all claims, demands, liabilities, fines, penalties, damages, costs and expenses (including, but not limited to, attorneys' fees and court costs) of any kind whatsoever ("Claims"), whether arising from any default under this Agreement or not, or in any way connected with this Agreement, or arising from any default on the part of Customer, Carrier, any consignee or any condition or inherent vice of the Goods carried under this Agreement, except to the extent such Claim is the result of SCS's willful misconduct or gross negligence. The provisions of this Section shall survive termination of this Agreement.

## X.    Term & Termination

A.    This Agreement shall commence on the Effective Date and shall continue in full force and effect until the completion of the Services, unless terminated earlier in accordance with this Section.

B.    Subject to Paragraph D, below, either Party may terminate this Agreement on fifteen (15) days prior written notice to the other Party.

C.    SCS may terminate this Agreement upon any failure of Customer to pay when due any amounts due pursuant to Section II, which failure remains uncured for a period of ten (10) days after notice thereof.

D.    If provided for in Exhibit A, Customer shall not have the right to cancel any charter flight unless Customer has, prior to the effective date of such cancellation, paid SCS a cancellation fee in the full amount as set forth in Exhibit A.

## XI.    Notices

All notices required to be given hereunder shall be given in writing and served by personal delivery, registered or certified mail, return receipt requested, postage prepaid, or by UPS Next Day Air®. Notices shall be deemed given on the date of personal delivery, or, if not personally delivered, on the date of receipt. All payments and notices to the Parties shall be directed to the addresses provided below or such other address as either Party shall specify in a written notice in accordance with this Section.

If to SCS:

    UPS Supply Chain Solutions, Inc.
    12380 Morris Road
    Alpharetta, GA 30005
    ATTN: Global Contracts Manager

If to Customer:
Foam Depot Inc
495 Aero Drive
Cheektowaga, NY 14225

with copy to:

    UPS Supply Chain Solutions, Inc.
    C/o United Parcel Service, Inc.
    ATTN: Legal Department
    55 Glenlake Parkway, NE
    Atlanta, GA 30328

## XII.    Miscellaneous Provisions

A. <u>Relationship of the Parties</u>. Except as may be set forth in a duly executed Power of Attorney, the relationship between Customer and SCS shall be that of independent contractors, and this Agreement shall create no relationship of joint venturers, partners, employment or principal and agent between the Parties. Except as may be set forth in a duly executed Power of Attorney, SCS has no right or authority to create any obligations expressed or implied on behalf of Customer, or to bind Customer in any manner except as provided in this Agreement.

B. <u>Assignment</u>. Customer shall not assign this Agreement or any of its rights or obligations under this Agreement without the prior written consent of SCS, and any purported assignment, sale, transfer, delegation or other disposition by Customer except as permitted herein shall be null and void. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.

C. <u>Governing Law; Jurisdiction and Venue</u>. Except where law or treaty mandate governing law, this Agreement shall be interpreted, construed and enforced according to the laws of the State of Georgia, without giving consideration to Georgia conflict of law and choice of law jurisprudence, and Customer and SCS (i) irrevocably consent to the jurisdiction of the United States District Court and the State courts of Georgia; (ii) agree that any action relating to the Services performed by SCS shall only be brought in such courts; (iii) consent to the exercise of in personam jurisdiction by such courts over it, and (d) further agree that any action to enforce a judgment may be instituted in any jurisdiction. This Agreement shall not be governed by the United Nations Convention on Contracts for the International Sale of Goods.

D. <u>Severability</u>. In the event that any provision of this Agreement (or any portion hereof) is determined by a court of competent jurisdiction to be illegal, invalid or otherwise unenforceable, such provision (or part thereof) shall be enforced to the extent possible consistent with the stated intention of the Parties, or, if incapable of such enforcement, shall be deemed to be deleted from this Agreement, while the remainder of this Agreement shall continue in full force and remain in effect according to its stated terms and conditions.

E. <u>Waiver</u>. A waiver, express or implied, by either Party of any right under this Agreement or of any failure to perform or breach hereof by the other Party hereto shall not constitute or be deemed to be a waiver of any other right hereunder or of any other failure to perform or breach hereof by such other Party, whether of a similar or dissimilar nature thereto. No failure to exercise and no delay in exercising any right, remedy or power hereunder shall operate as a waiver thereof.

F. <u>No Third Party Beneficiaries</u>. Except as set forth in Section VII (E), this Agreement is not intended to give, and shall not be construed to give, any person or entity other than the Parties hereto, any interest, any legal or equitable rights, any claims or remedies (including, without limitation, any third party beneficiary rights) under or by reason of this Agreement, or as a result of the performance or non-performance of the Services.

G. <u>Entire Agreement; Modification</u>. The terms and conditions of this Agreement, including Exhibit A, is the final, complete, and exclusive agreement of the Parties with respect to the Services contemplated hereunder. The Parties shall not be bound by any representations, promises, inducements or agreements, verbal or written, prior or contemporaneous, not expressly set forth or referenced in this Agreement. In the event of a conflict between this Agreement, any transportation document, including air waybill, issued in connection with the Services, or any other written agreement between the Parties, the terms of this Agreement shall control. No modification of or amendment to this Agreement shall be effective unless in writing and signed by each of the Parties.



H. <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, with the same effect as if the Parties had signed the same document.  Each counterpart so executed shall be deemed to be an original, and all such counterparts shall be construed together and shall constitute one Agreement.

The SCS-affiliated party(ies) signing below shall be the SCS party(ies) for purposes of this Agreement, and any SCS-affiliated party(ies) NOT signing below is NOT included as an SCS party.

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the Effective Date.

**UPS SUPPLY CHAIN SOLUTIONS, INC.**
**"SCS"**

**Signature**      Vito Losurdo

**Printed Name**      VP Global Air Freight Services

**Title**      April 9 2020

**Date**

**Foam Depot Inc**
**"CUSTOMER"**

**Signature**      JASON ARMSTRONG

**Printed Name**      PRESIDENT

**Title**      4/9/2020

**Date**

**UPS EUROPE SPRL**

**Signature**

**Printed Name**

**Title**

**Date**

**UPS ASIA GROUP PTE. LTD.**

**Signature**

**Printed Name**

**Title**

**Date**

**UPS SCS, INC.**

**Signature**

**Printed Name**

**Title**

**Date**



**EXHIBIT A**
UPS Supply Chain Solutions
Global Air Charter Services Agreement

A.    **DESCRIPTION OF SERVICES.**

1.    Description of Goods: Gloves

2.    Charter Flight Details

| FLIGHT # | DEPART AIRPORT | DEPART TIME | DEPART DATE | DEPART DAY | ARRIVE AIRPORT | ARRIVE TIME | ARRIVE DATE | ARRIVE DAY |
|---|---|---|---|---|---|---|---|---|
| 1 | HKG | 0900Z | 18Apr2020 | Sat | ANC | 2000Z | 18Apr2020 | Sat |
| 2 | ANC | 2100Z | 18Apr2020 | Sat | LCK | 0345Z | 19Apr2020 | Sun |
| 3 | | | | | | | | |

3.    Aircraft Type: B747-400F

4.    Using aircraft type data, approximate maximum projected gross payload weight or payload volume is 100,000 KGs.

ANY PROJECTED PAYLOADS SHOULD IN NO WAY BE CONSTRUED TO REPRESENT A GUARANTEE.  No confirmation of loadability is given and loadability of Goods is subject to volume and dimension of aircraft. The aircraft data reflects typical wind and temperature conditions over the scheduled flight plan.  Current conditions, including, but not limited to, wind, temperature and weather on the date of the flight shall be used to determine maximum gross payload.

B.    **CHARTER FEES**

1.    Amount of Charter Fees: $1,075,000

| FLIGHT # | DEPART AIRPORT ' | DEPART TIME | DEPART DATE | DEPART DAY |
|---|---|---|---|---|
| 1 | HKG | 0900Z | 18Apr2020 | Sat |
| 2 | ANC | 2100Z | 18Apr2020 | Sat |
| 3 | | | | |

a.    The Charter Fees are subject to adjustment for foreign exchange rates, operational costs (which may include without limitation increases in fuel costs prior to the date Services are provided), and scheduling or routing changes.

b.    Charter Fees include:
          Aircraft Handling Charges
          Airport to Airport, including load/offload
          Cargo build / Cargo break

      Excluded Items:

          Origin Pickup Fees
          Destination Delivery Fees
          Non-Objection Fees, Royalties
          Cargo Acceptance Fees
          Any additional loading & un-loading equipment – i.e. Crane, Large Forklift, etc.
          Shoring an Frangible Material
          De-Icing, FET
          512b Charges, warehouse fees
          Terminal Fees
          Customs Fees
          War risk insurance

c.    Demurrage Charges:    Carrier shall have entire discretion in deciding the number of maximum layover at point of origin and destination and scheduled traffic stops for loading and unloading, clearance and similar requirements without any additional charge. If any delay in the commencement or completion of the Charter is caused by the Charterer or anyone acting on his behalf in excess of these maximums, demurrage shall run against the Charterer for such delay of USD 7500 per hour. These delays shall include, but are not limited to, unavailability of cargo 'ready-

i

Date: 4/9/2020
Name: JASON ARMSTRONG
Initial:



for-carriage' loading at time specified, inadequate customs documentation, loading and unloading when the responsibility of the Charter or its agents, and any consequential delays resulting there from.

2.    Payment of Charter Fees. Due 5 business days prior to departure, April 13th, 2020

3.    Payment Instructions.  Unless otherwise specified by written agreement between the Parties, payment of the Charter Fees is to be made by wire transfer to the following account:

JP Morgan Chase
131 South Dearborn - 6th Floor
Chicago, IL 60603
Bank Phone: 800-568-8772

| **ACH Routing and Account numbers** | **Wires Routing and Account numbers** |
|---|---|
| ACH ABA # 071000013 | Wire ABA # 021000021 |
| Account Name: UPS Supply Chain Solutions | SWIFT Code CHASUS33 |
| Account Number: 731201737 | Account Name: UPS Supply Chain Solutions |
| Account Type: DDA | Account Number: 731201737 |
| Tax ID: 94-3083515 | Account Type: DDA |
| Bank ACH Dept Phone: 813-432-3700 (Service) | Tax ID: 94-3083515 |
| 813-432-3800 (Transmission) | Bank Wire Dept Phone: 877-204-1123 (opt 1) |

4.    Cancellation Fees: _____

| Notice Time | Payment Penalty |
|---|---|
| More than 21 Days from Departure | 25% of the charter cost |
| Between 7 and 21 Days from Departure | 50% of the charter cost |
| Between 3 and 7 Days from Departure | 75% of the charter cost |
| 3 or Less Days from Departure | 100% of the charter cost |

SCS's right to such cancellation fees shall not limit any other remedies SCS may have at law or in equity, for damages based on such termination or cancellation.

ii

Date: 4/9/2020
Name: JASON Armstrong
Initial:



# UPS Supply Chain Solutions
# Charter Quote

Date of Quote:
8 April 2020

## Availability

| Origin: | HKG |
|---|---|
| **Destination:** | LCK |
| **Dates:** | TBA |
| **Aircraft:** | B747-400F |
| **Payload (KGs):** | 100,000 |
| **Estimated Sell Rate:** | USD 1,075,000 |

## Inclusions ✓

**Aircraft Handling Charges**
**Airport to Airport, including load/offload**
**Cargo build / Cargo break**

## Exclusions ✗

**Origin Pickup Fees**
**Destination Delivery Fees**
**Non-Objection Fees, Royalties**
**Cargo Acceptance Fees**
**Any additional loading & un-loading equipment –** *i.e. Crane, Large Forklift, etc.*
**Shoring an Frangible Material**
**De-icing, FET**
**512b Charges, warehouse fees**
**Terminal Fees**
**Customs Fees**
**War risk insurance**

## Operations Subject to:

**On-going aircraft availability**
**Load-ability of the Cargo**
**Traffic Rights & Over-flight Permits**
**Cargo being suitably packed for airfreight**
**Fuel & Insurance Cost Fluctuations**
**Signed UPS SCS Charter Contract**
**Payment in full before departure**

*All pricing and availability is subject to change, this is an indication without obligation.*

© 2020 United Parcel Service of America, Inc. UPS, the UPS brandmark and the color brown are trademarks of United Parcel Service America, Inc. All rights reserved.

# Exhibit 2

**Foam Depot**

495 Aero Dr.

Cheektowaga, NY  14225 US

8443626255

customerservice@foamdepot.com



# INVOICE

| BILL TO | SHIP TO | |
|---|---|---|
| Jantien Delfsma | Jantien Delfsma | **INVOICE #** 5554 |
| UPS Supply Chain Solutions | UPS Supply Chain Solutions | **DATE** 04/28/2020 |
| 12380 Morris Road | 12380 Morris Road | **DUE DATE** 04/28/2020 |
| Alpharetta, GA  30005 | Alpharetta, GA  30005 | **TERMS** Due on receipt |
| United States | United States | |

| DATE | ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| 04/28/2020 | **Air Freight** | Charter flight from China to New York To move 100,000 KG's. | 1 | 1,950,000.00 | 1,950,000.00 |
| 04/28/2020 | **Handling fees** | Handling fee, Fuel  ETC. .59 per KG | 100,000 | 0.59 | 59,000.00 |
| 04/28/2020 | **discount** | Minus amount of charter from SCS mishandling | 1 | - 1,075,000.00 | -1,075,000.00 |
| | | Please remit payment as soon as possible so Foam Depot Inc can balance books out. Thank you | | | |

Thank you for your business and have a great Day!

BALANCE DUE

# $934,000.00

TERMS AND CONDITIONS OF ANY SALE OF PRODUCTS HERE UNDER WILL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, ENFORCEMENT OF AN ARBITRATION OR LITIGATION WILL BE BROUGHT EXCLUSIVELY IN ERIE COUNTY, NEW YORK, CUSTOMER CONSENTS TO THE JURISDICTION OF THE FEDERAL AND STATE COURTS LOCATED THEREIN,SUBMITS TO THE JURISDICTION THEREOF AND WAIVES THE RIGHT TO CHANGE VENUE.

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2020, I electronically filed **FOAM DEPOT, INC.'S AFFIRMATIVE DEFENSES, ANSWER, AND COUNTERCLAIM TO COMPLAINT** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorney of record:

> Jonathan R. Friedman, Esq.
> Gary J. Toman, Esq.
> **WEINBERG WHEELER HUDGINS**
> **GUNN & DIAL, LLC**
> 3344 Peachtree Road, Suite 2400
> Atlanta, Georgia 30326
> jfriedman@wwhdg.com
> gtoman@wwhgd.com

*s/ Joseph J. Dinardo*
Joseph J. Dinardo
Attorney Bar Number: 302914

**SMITH, CURRIE & HANCOCK LLP**
2700 Marquis One Tower
245 Peachtree Center Avenue, NE
Atlanta, Georgia 30303-1227
Telephone: (404) 521-3800
Facsimile: (404) 688-0671
jjdinardo@smithcurrie.com